318 Ga. 213
FINAL COPY

S23A0936. HOLMES v. THE STATE.

COLVIN, Justice.

Appellant Shomari Tahir Holmes appeals his convictions for felony murder and other crimes related to the death of his 20-month-old son, Shomari Holmes, Jr. ("Shomari"), and for cruelty to children in the first degree against Shomari's three-year-old half-sister, S. D.[1]

---

[1] Shomari was brought to the hospital by paramedics on February 11, 2017. Following his transfer to another facility, he was pronounced dead on February 16, 2017. On June 28, 2019, a Cobb County grand jury returned the 16-count superseding indictment on which Appellant was tried. Appellant was charged with malice murder (Count 1), three counts of felony murder (Counts 2, 4, and 6), two counts of aggravated assault (Counts 3 and 8), three counts of aggravated battery (Counts 5, 10, and 12), and seven counts of cruelty to children in the first degree (Counts 7, 9, 11, and 13-16). On October 30, 2019, Appellant filed a "Notice of Intention of Defense to Raise Issue of Insanity, Mental Illness, or Intellectual Disability at the Time of the Act."

Appellant was tried by a jury from December 13, 2021, to December 20, 2021. The jury returned a verdict of not guilty as to malice murder (Count 1) but found Appellant guilty but mentally ill with respect to all other counts. On January 31, 2022, the trial court sentenced Appellant to life in prison for felony murder (Count 2), merged Appellant's conviction for aggravated assault (Count 3) into Count 2 for sentencing purposes, and issued nine consecutive sentences of 20 years in prison for Counts 8 through 16. The trial court also vacated Counts 4 through 7, and neither party raises a sentencing error. See *Dixon v. State*, 302 Ga. 691, 698 (4) (808 SE2d 696) (2017) ("[W]hen a merger error benefits a defendant and the State fails to raise it by cross-appeal, we

Appellant, who was found guilty but mentally ill by a jury, asserts on appeal that the trial court: (1) abused its discretion in admitting an audio recording of an interview of Appellant conducted by Dr. Matthew Norman, a psychiatrist and expert witness for the State, and (2) erred by failing to instruct the jury on a verdict of "guilty but with intellectual disability." As explained below, we conclude that Appellant's claims fail. We therefore affirm Appellant's convictions.

1. At trial, Appellant's counsel conceded that Appellant had physically abused Shomari and S. D., and that Appellant's abuse of Shomari caused his death, but presented evidence and argument that Appellant's actions were the result of his then-undiagnosed schizophrenia. The evidence at trial showed the following.

In January 2017, Appellant moved into a two-bedroom

henceforth will exercise our discretion to correct the error upon our own initiative only in exceptional circumstances."). Appellant was accordingly sentenced to a total of life in prison plus 180 years.

Appellant filed a motion for new trial on February 22, 2022, which he amended through new counsel on November 10, 2022. The trial court held a hearing on Appellant's motion, as amended, on January 4, 2023, and denied Appellant's motion by written order on January 24, 2023. Appellant filed a timely notice of appeal to this Court on February 17, 2023. The case was docketed to this Court's August 2023 term and submitted for a decision on the briefs.

apartment in Cobb County with his romantic partner, Chantelle Driver, their 20-month-old son, Shomari, and Driver's three-year-old daughter, S. D.

At approximately 4:20 p.m. on February 11, 2017, Driver called 911 for assistance because Shomari was not breathing. Shomari was transported first by ambulance to Kennestone Hospital, where medical providers revived him and placed him on mechanical ventilation, and then by helicopter to Children's Healthcare of Atlanta at Scottish Rite ("CHOA") for further treatment at CHOA's pediatric intensive care unit. Despite this additional treatment, Shomari never recovered, and he was pronounced dead on February 16, 2017.

Physical examinations of Shomari before and after his death revealed numerous and extensive injuries. Among them were bruises on his abdomen, arms, and back, some of which were consistent with blows from a belt or a cord. Shomari had retinal hemorrhages, a healing fracture of his mandible (jawbone), subdural hemorrhages on both sides of his head, subdural bleeding in between

the two halves of his brain, swelling of his cervical spine, an adrenal hematoma near the top of his kidney, a bruised lung, and 14 rib fractures. The Cobb County medical examiner who performed Shomari's autopsy determined that Shomari's cause of death was abusive head trauma and accordingly ruled his death a homicide. A separate examination of S. D. by a detective with the Marietta Police Department and a member of the Georgia Department of Human Services, Division of Family and Children Services, revealed numerous bruises and scratches consistent with being spanked with a belt.

On the day of Shomari's hospitalization, Appellant admitted to officers at his apartment and again at Kennestone Hospital that he had given both Shomari and S. D. a "whooping" earlier that day. Following Shomari's transfer to CHOA that evening, Appellant was taken to the Marietta Police Department where he waived his *Miranda* rights[2] and was interviewed by detectives. During the

---

[2] See *Miranda v. Arizona*, 384 U. S. 436, 444 (86 SCt 1602, 16 LE2d 694) (1966).

interview, which was video-recorded and played for the jury, Appellant explained that he had found Shomari and S. D. sleeping in the same bed together on multiple occasions. Appellant further claimed that he had witnessed the children engaging in inappropriate sexual behavior, including taking each other's diapers off and touching each other's genitals. Appellant explained that talking to his children had failed to correct this behavior, and so, over the course of the previous week, he had spanked both children on five separate occasions for getting in the same bed. Appellant stated that he initially spanked the children with his hand but that he began using a belt on the day before Shomari was hospitalized. Further questioning revealed that Appellant had also punched Shomari "quite a bit" with "force" in his head and abdomen. Appellant admitted that he had punched Shomari between two and four times on each of the three days preceding Shomari's hospitalization.

Following Appellant's arrest, he was examined by three different experts who later testified at trial. In September 2017, Dr.

5

Keanna Wright, a psychologist for the Georgia Department of Behavioral Health and Developmental Disabilities and an independent expert for the court, evaluated Appellant to assess his mental condition at the time of the crimes. During these interviews, Appellant initially denied having visual and auditory hallucinations but later reported that he had heard a voice that told him to "whoop" his children. Appellant also reported, however, that the voices told him, "[T]his is your child," and "You're angry, stand down[.]" Notwithstanding these messages, Appellant said, "[He] thought [he] would whoop them." Following Dr. Wright's interview, Appellant was independently diagnosed with schizophrenia by a psychiatrist associated with the Cobb County Adult Detention Center who did not testify at trial.

In May 2019, Dr. Robert Obst, a licensed clinical psychologist, interviewed Appellant on behalf of the defense. During the interview, Appellant stated that the voices he had heard did not tell him to hit his son, and that "[he] just did it." Dr. Obst further testified that he agreed with Appellant's prior diagnosis of

6

schizophrenia, and he opined that Appellant was in the "beginning stages" of schizophrenia at the time of the crimes.

In April 2020, Dr. Matthew Norman, a board-certified psychiatrist, examined Appellant on behalf of the State. During this interview, which was audio-recorded and played for the jury, Appellant stated that he had heard voices telling him to "discipline" his son "much stricter," but he also reported that the voices never told him to do anything other than spank Shomari, and they had not told Appellant to hit Shomari in the head or the ribs. Appellant further stated that he knew in February 2017 that it was wrong to hit Shomari in the ribs and head to the point of breaking bones and causing a severe injury.

2. Appellant contends that the trial court abused its discretion in admitting into evidence the audio-recorded interview between Appellant and the State's psychiatrist, Dr. Norman. Appellant first argues that the evidence should have been excluded because it violated the trial court's earlier ruling excluding ultimate-issue testimony under OCGA § 24-7-704 (b). Appellant also argues that

Dr. Norman's interview violated Appellant's right to counsel under the Fifth and Sixth Amendments to the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution in several different ways.[3] For the reasons explained below, these claims fail.

(a) A review of the record shows that in October 2019, Appellant's counsel filed a "Notice of Intention of Defense to Raise Issue of Insanity, Mental Illness, or Intellectual Disability at the Time of the Act." Following this notice, the State moved for an independent psychological evaluation pursuant to OCGA § 17-7-130.1.[4] On March 17, 2020, the trial court granted the State's

_____

[3] We decline to consider Appellant's right-to-counsel claim under the Georgia Constitution because Appellant does not argue that his right to counsel under the Sixth Amendment to the United States Constitution applies differently than his right to counsel under Article I, Section I, Paragraph XIV of the Georgia Constitution and because neither Appellant nor the trial court distinguished between Appellant's federal and state right-to-counsel claims in the proceedings below. See *Regan v. State*, 317 Ga. 612, 612 n.2 (894 SE2d 584) (2023) (declining to consider the defendant's equal-protection claims under the Georgia Constitution where neither the defendant nor the trial court below distinguished between the defendant's claims under the federal and state Constitutions).

[4] OCGA § 17-7-130.1 provides that "[w]hen a notice of an insanity defense is filed, the court shall appoint at least one psychiatrist or licensed

8

motion and ordered that "[t]he defendant . . . make himself available to the State's psychiatrist/psychologist for the purpose of an independent psychological evaluation." Counsel for the State and the defense were served with a copy of the order. Consistent with the trial court's order, Dr. Norman interviewed Appellant on April 1, 2020.

At trial, Appellant's counsel made an oral motion in limine "to keep out any testimony from any witness on their opinion as to whether [Appellant] was experiencing symptoms of psychosis on the date of the incident." After argument from the parties, the trial court ruled:

> None of the medical experts can testify on the day in question as to whether or not [Appellant] was or was not experiencing psychosis based upon their observations. They could say, based upon their evaluations, what they believe psychosis looks like, and they could say what they believe for him, particularly, based upon their

psychologist to examine the defendant and to testify at the trial." See *Motes v. State*, 256 Ga. 831, 833 (2) (353 SE2d 348) (1987) (explaining that "[i]f the defendant wants to introduce expert testimony, then the state must be allowed the same privilege and the defendant must cooperate, in light of [the defendant's] partial waiver of the right to remain silent. If the defendant chooses to prove insanity by means other than expert testimony . . . the partial waiver does not arise, and the case may proceed as any other" (citation and punctuation omitted)).

observations, how it would manifest itself with symptoms. They cannot take the additional step to say, and I don't believe I saw that from him on this day. They simply could point out . . . what they believe those things manifest for him generally. They cannot, pursuant to 24-7-704 (b),[5] get to the ultimate issue which is his state of mind, mental state or condition, on the day in question.[6]

Prior to Dr. Norman taking the stand, the State indicated that it planned to tender the audio recording of Dr. Norman's April 1, 2020 interview with Appellant. The State further indicated that it had redacted two segments of the interview to remove Appellant's references to a previous arrest and a previous stay in jail not at issue here and that the State had presented the redacted version of the

---

[5] OCGA § 24-7-704 (b) provides:

No expert witness testifying with respect to the mental state or condition of an accused in a criminal proceeding shall state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

[6] Appellant's motion in limine and the trial court's related ruling were made after Dr. Obst had testified on behalf of Appellant but before Dr. Wright and Dr. Norman testified. Dr. Wright and Dr. Norman were therefore prevented from testifying as to whether Appellant was experiencing psychosis when the crimes were committed, even though the jury had already heard Dr. Obst's testimony that Appellant was suffering from the first ("prodromal") stage of schizophrenia at that time.

recording to Appellant's trial counsel "early in the week." Outside the presence of the jury, portions of the recording were played to confirm that the redactions were correctly made. Dr. Norman then took the stand and was qualified as an expert. After laying its foundation, the State moved to tender the audio recording of Dr. Norman's interview with Appellant. Appellant's trial counsel responded, "[n]o objection as per our previous agreement."

The recording was then played for the jury. At the outset of the interview, Dr. Norman introduced himself to Appellant and explained the purpose of the evaluation as follows:

> DR. NORMAN: I'm Dr. Norman. Before you and I sit down and talk, let me read this form to you. . . . I'm reading this form to tell you that the prosecuting attorney in your case has asked for a psychiatric evaluation. The Judge in your case has ordered that evaluation and I will be doing that evaluation, okay?
> . . .
> I'll be evaluating your past and current mental condition and your mental condition around the time of the alleged offense. That is, how you were thinking and feeling around the time that the crime was committed. I will talk with you about your thinking and feelings —

At this point in the proceeding, Appellant's counsel objected, but the

recording continued to play:

> — and I may want to check other reports about you. This evaluation is different from one in which you're seeing a doctor for treatment. It is not —

The recording was then paused for the following argument and ruling on Appellant's objection:

> TRIAL COUNSEL: I object to one of the statements made by Dr. Norman when he's reading this form, and I believe that it contravenes one of the rulings that you made in this case previously.
> COURT: That objection was waived whenever [the State] tendered the exhibit and you admitted it. It is now in evidence and it may be played in [its] entirety.

The recording then resumed:

> DR. NORMAN: [It is not] confidential. Anything you say or do I may discuss with the Judge, prosecutor, and your attorney, put it in my report, or testify about it in court. After I've done my evaluation, I may send a written report to the prosecutor. You have the right to not answer questions about your case or your mental condition. You have the right to not talk about your actions at the time of the alleged offense. I will be audio recording the evaluation, Mr. Holmes. That's for my own notes. It also ensures that if your attorney says, hey, what'd you ask him, they have the ability to listen to it and see exactly what we talked about, okay. Any questions about what I have read to you, sir?
> HOLMES: No.
> DR. NORMAN: Okay. The key thing to keep in mind, Mr.

Holmes, is I don't work for the prosecutor. I've been hired by their office to do an evaluation, but my ethical obligation is to call it the way I see it. I'm supposed to be fair and objective. That is my goal, sir. You've just got to keep in mind, because I've been court ordered to do this, I can't keep secrets. So, if there's something you don't want to tell the Judge or prosecutor or your attorney, just say, hey, man, I don't want to talk about that, okay? I'll tell you why I'm asking the question. I'm happy to do that. I'm not trying to trick you in any way. I want to be as transparent as I can, okay?

After Dr. Norman made these introductory remarks, Appellant signed a form acknowledging that he understood Dr. Norman's disclaimers, and the interview proceeded.

In Appellant's motion for new trial, Appellant raised several arguments concerning the admission of Dr. Norman's interview, including those that he now raises on appeal. During the hearing on Appellant's motion, Appellant's trial counsel testified that she had not been given advance notice of the time and place of Dr. Norman's interview with Appellant or been "given an opportunity to participate in any way." Trial counsel confirmed, however, that she had received the recording and a transcript of the interview "very shortly before trial." Trial counsel explained that, when the

interview was tendered and she stated that she had "[n]o objection as per our previous agreement," she was referring to the trial court's "previous ruling" on ultimate-issue testimony, rather than to an agreement with the State to redact certain portions of the recording and to publish the redacted recording for the jury by playing it on the prosecutor's laptop.

In its order denying Appellant's motion for new trial, the trial court concluded that Appellant had waived his objection to the admission of Dr. Norman's interview. The trial court also concluded that it had not erred because Appellant did "not have either a Sixth Amendment right to counsel or a Fifth Amendment right requiring that his *Miranda* rights be repeated to him during the interview with [the State's expert]." The trial court further found that Appellant's trial counsel had general notice of the interview and that even though it was not legally necessary, "Dr. Norman advised Defendant regarding the purpose of the evaluation, lack of confidentiality, and the right to not answer any questions." Lastly, the trial court concluded that the portion of Dr. Norman's interview

14

to which Appellant objected did not violate the court's previous ruling on ultimate-issue testimony under OCGA § 24-7-704 (b), which precludes experts from stating "an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element . . . of a defense thereto."

(b) (i) Even assuming that Appellant preserved his objection under OCGA § 24-7-704 (b) to the admission of Dr. Norman's interview for ordinary appellate review, Appellant has failed to show that the trial court abused its discretion by admitting it into evidence. Appellant argues that Dr. Norman's statement that he would be evaluating "[Appellant's] mental condition around the time of the alleged offense [i.e.,] how [Appellant was] thinking and feeling around the time that the crime was committed" violated the trial court's earlier ruling excluding expert opinion testimony on the ultimate issue of Appellant's mental state at the time of the crimes under OCGA § 24-7-704 (b). Appellant claims that this statement "clearly indicate[s] that his examination covered criminal responsibility at the time of the alleged crime at issue which is solely

for the jury." Dr. Norman's remarks, however, only addressed the purpose of the interview and did not constitute an opinion or inference of any sort — let alone an opinion or inference about Appellant's mental state at the time of the crime. Dr. Norman's statement therefore did not violate either OCGA § 24-7-704 (b) or the trial court's previous ruling pursuant thereto. Moreover, our review of the record reveals no instance in which Dr. Norman offered an opinion about Appellant's mental condition. As such, Appellant fails to show the trial court abused its discretion.

(ii) Appellant also argues that Dr. Norman's interview violated his rights under the Fifth and Sixth Amendments[7] to the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution because (i) Appellant's counsel was not

_____

[7] Appellant contends that Dr. Norman's failure to advise Appellant of his right to counsel violated his rights under the Sixth Amendment as enunciated in *Miranda*, but the rights described in *Miranda* are grounded in the Fifth Amendment. See *Dickerson v. United States*, 530 U. S. 428, 433, 435 n.1 (120 SCt 2326, 147 LE2d 405) (2000) (describing the Self-Incrimination Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment as the bases for the constitutional rule announced in *Miranda*). See also *Miranda*, 384 U. S. at 512 (II) (noting that the Sixth Amendment "is never expressly relied on by the [majority opinion]." (Harlan, J., dissenting)).

notified of the date and time of the interview, (ii) Dr. Norman did not provide Appellant with a second, full *Miranda* warning,[8] and thereby failed to advise him of his right to counsel, and (iii) Dr. Norman's introductory remarks were "intentionally misleading and deceitful," such that they created a "violation[ ] of constitutional proportion."

Though Appellant objected to the admission of Dr. Norman's interview — albeit after the recording had been tendered into evidence — Appellant did not raise the constitutional arguments he now asserts until his motion for new trial. As such, Appellant's constitutional claims regarding the admission of the interview are subject only to plain-error review. See *Jones v. State*, 317 Ga. 466, 472 (2) (893 SE2d 741) (2023) ("In order to preserve an objection for ordinary appellate review, the specific ground of the objection must be made at the time the challenged evidence is offered." (citation and punctuation omitted)). Plain-error review consists of four prongs:

---

[8] Appellant was first read his *Miranda* rights at the beginning of his interview with detectives from the Marietta Police Department on the day that Shomari was hospitalized.

17

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Williams v. State*, 315 Ga. 490, 495 (2) (883 SE2d 733) (2023) (emphasis in original). "The failure to meet one element of this test dooms a plain error claim." *Rogers v. State*, 311 Ga. 634, 638 (3) (859 SE2d 92) (2021).

Appellant's claims under the Fifth and Sixth Amendments fail because, as we have repeatedly held, when a criminal defendant raises a defense of insanity and calls an expert witness to testify in his defense, the defendant must submit to an examination by the State's expert, during which examination the criminal defendant does "not have either a Sixth Amendment right to counsel or a Fifth

18

Amendment right requiring that his *Miranda* rights be repeated to him during the interview with [the State's expert]." *Walker v. State*, 290 Ga. 467, 469 (2) (722 SE2d 72) (2012) (citation and punctuation omitted). See *Nance v. State*, 272 Ga. 217, 219 (2) (526 SE2d 560) (2000) (explaining that the rule requiring a defendant who elects to present the testimony of a mental health expert, "has been likened to the defendant's waiver of his privilege against self-incrimination should he choose to testify on his behalf"); *Godfrey v. Francis*, 251 Ga. 652, 657 (5) (308 SE2d 806) (1983) (holding that the appellant did not have "a constitutional right to the presence of counsel during the state's psychiatric examination" and that "[a] full, separate, second [*Miranda*] warning was not necessary" because the appellant had been given "a full and proper *Miranda* warning at the time of his arrest." (citation and punctuation omitted)); *Strickland v. State*, 247 Ga. 219, 220 (1) (275 SE2d 29) (1981) (holding that the trial court did not err by denying defense counsel's request to be present during the defendant's court-ordered psychiatric evaluation because it was not a "critical stage" of the proceedings under the Sixth

Amendment). Because Appellant's rights to counsel under the federal and state Constitutions did not apply during his interview with Dr. Norman, his claims that those rights were violated necessarily fail to establish a clear or obvious legal error.

To the extent Appellant relies on *Estelle v. Smith*, 451 U. S. 454 (101 SCt 1866, 68 LE2d 359) (1981) to contend that Dr. Norman's "misleading" remarks constituted a violation of "constitutional proportion," that claim also fails. Citing *Estelle*, Appellant claims that "where a psychological examination is to be given for one purpose (fitness for trial), but used for another at trial (sentencing) violations of constitutional proportion can occur requiring reversal." Appellant does not explain his argument further, but he appears to draw an unstated analogy between the use of Dr. Norman's interview and the use of the psychiatrist's interview in *Estelle*. Here, Appellant claims, Dr. Norman stated that he was recording the interview for his "own notes," but the recording was ultimately used at trial to show Appellant's mental state at the time of the crime. Analogously, the psychiatrist in *Estelle* evaluated the defendant for

20

competency to stand trial, but the psychiatrist's testimony was used during the penalty phase of the defendant's death-penalty trial to support future dangerousness. See *Estelle*, 451 U. S. at 456-460 (I) (A). Because the United States Supreme Court concluded that the psychiatrist's testimony in *Estelle* violated the Fifth and Sixth Amendments to the United States Constitution, so too, Appellant impliedly claims, does Dr. Norman's recording. See id. at 471 (II) (B). But *Estelle* is clearly inapposite: unlike Appellant, the defendant in *Estelle* did not claim insanity or mental illness as a defense. Id. at 466 (II) (A) (2). And as *Estelle* itself explains, these differences matter: "[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue he interjected into the case." Id. at 465 (II) (A) (2). Because Appellant put his mental condition at issue, *Estelle* does not apply, and Appellant's argument by analogy fails to demonstrate a clear or obvious legal error.

3. In his second enumeration of error, Appellant contends that

the trial court erred by failing to charge the jury on a possible verdict of "guilty but with intellectual disability," as required by subsections (b) and (c) of OCGA § 17-7-131. As we explain below, however, Appellant did not preserve this issue for ordinary appellate review, and he fails to show plain error.

OCGA § 17-7-131 (b) (1) provides that, "[i]n all cases in which the defense of insanity, mental illness or intellectual disability is interposed, the jury . . . shall find whether the defendant is: (A) [g]uilty; (B) [n]ot guilty; (C) [n]ot guilty by reason of insanity at the time of the crime; (D) [g]uilty but mentally ill at the time of the crime . . . ; or (E) [g]uilty but with intellectual disability[.]" Subsection (c) provides that, where any such a defense is raised, "the trial judge shall instruct the jury" on each of the five possible verdicts enumerated above. OCGA § 17-7-131 (c). Lastly, paragraph (b) (3) provides that the "trial judge shall charge the jury, in addition to other appropriate charges," on the consequences to the defendant arising from each of the five possible verdicts by means of the specific statutory language provided therein. OCGA § 17-7-131 (b)

22

(3).

Appellant initially requested that the court instruct the jury on all five possible verdicts available where a defendant has raised a defense involving his mental condition, but at the charge conference, Appellant's counsel withdrew her request for the trial court to charge the jury on a verdict of "guilty but with intellectual disability." See OCGA § 17-7-131 (b) (1) (E). Though the trial court stated, "I believe by law I have to give it," trial counsel responded, "[I]f there's no evidence to support the omitted option it's harmless error." The trial court then confirmed that Appellant did not want it to charge the jury on subparagraph (E) as follows:

> COURT: Is the Defense asking me to give ([E]) or not?
> TRIAL COUNSEL: Intellectual disability, no.
> COURT: All right, so I will take out ([E]). The State has requested that. The Defense does not want me to give that and I will not, based on that. It's your defense.

Consistent with this exchange, Appellant did not object after the court failed to give jury instructions regarding a verdict of guilty but with intellectual disability.

When a party fails to object to the trial court's omission of a

jury charge before the jury retires to deliberate, the party's claims "may be reviewed on appeal only for 'plain error.'" *Walker v. State*, 301 Ga. 482, 485 (2) (801 SE2d 804) (2017) (quoting OCGA § 17-8-58 (b)). Further, we have held that, when a defendant requests a specific jury instruction at the outset of trial but later withdraws the request during the charge conference, the defendant has affirmatively waived any right to the charge and the defendant's claim on appeal concerning the charge fails. See *Walker*, 301 Ga. at 485 (2) (a) (holding that the defendant affirmatively waived his right to a voluntary manslaughter charge where counsel initially requested the charge but later withdrew it at the charge conference). See also *Lewis v. State*, 312 Ga. 537, 541 (2) (863 SE2d 65) (2021) (holding that the defendant affirmatively waived an alleged error regarding the trial court's failure to instruct the jury on voluntary manslaughter where trial counsel initially requested and then affirmatively opposed the instruction at the charge conference). Here, trial counsel initially requested that the jury be instructed on a possible verdict of "guilty but intellectually disabled" but later

24

expressly requested that the court omit such instruction at the charge conference. Trial counsel's request for the instruction to be omitted amounted to an affirmative waiver. As such, Appellant's claim fails.

*Judgment affirmed. All the Justices concur.*

Decided February 6, 2024.

Murder. Cobb Superior Court. Before Judge Marbutt.

*Kennedy & Kennedy, Reid G. Kennedy*, for appellant.

*Flynn D. Broady, Jr., District Attorney, Elizabeth M. York, Linda J. Dunikoski, Leslie A. Coots, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Clint C. Malcolm, Senior Assistant Attorneys General*, for appellee.