30157.  MURPHY *v.* THE STATE.

388

Decided October 8, 1943.    Rehearing denied December 20, 1943.

*Robert B. Blackburn,* for plaintiff in error.

*Lindley W. Camp, solicitor, John A. Boykin, solicitor-general, Durwood T. Pye,* contra.

MacIntyre, J.    ■    The defendant was tried on an accusation charging him with the offense of intentionally pointing a gun at another in violation of the Code, § 26-5107.    F. L. Smith, a police officer of the City of Atlanta, testified that he and his partner, J. B. Harper, received a call from the defendant's mother to come to her home and get the defendant; that upon their arrival there, she told them that her son was intoxicated, and she wanted them to make him go to bed.    She refused to prosecute him, and they left. Approximately an hour and a half later a man named McCulloght called and said that the defendant had threatened to kill him with a shotgun.    The officers returned to the house, and as they walked up on the front porch, the defendant, who was "standing inside the living room . . . the front door (being) open, . . leveled a shotgun at the officers and told us not to come in.    It was pointed directly at us.    It was pointed at both of us, first at (Harper) and then at me.    He pointed it at me and said, 'Don't come in here.' I (Smith) told him to put the shotgun down . . and the defendant's mother ran up behind us crying, 'Don't shoot him.'    And . . I motioned to Lt. Thomas (police officer) to go to the back, and he came up from the back and took the gun away from him. The gun was loaded. . .    We did not draw a gun on him first, both of us had our hands on our hips, but we never did draw our guns out."    The defendant's mother testified in part: "The defendant did not actually point the gun at the officers; his condition was such that I had occasion to appeal to the officers of the law to protect me.    As to his mental condition at that time, he had been drinking and was under the influence of dope.    The doctor had come out and given him a shot, and he got that gun and said he was going to kill himself, and I called the officers for his own pro-

tection and everyone else's. I own the house, and went and called the officers. I stood on the outside until the officers came . . and he came and opened the door and had the gun in his left hand. The officers came there on more than one trip. The first trip they didn't take him out of the house. Then in an hour and a half he became wild again. I thought he was going to kill himself and that is why I called the officers. I called the officers the second time. I came in right behind them when they came on the porch. The officers had their guns out and threatened my son." The defendant's mother was the only witness introduced by him, and his counsel contended that her testimony showed that the defendant was insane at the time of the commission of the alleged crime. However, one of the officers (J. B. Harper) testified: "As to whether he wasn't in a very bad shape mentally, *he was drunk*. As to whether he was so drunk that he hardly knew what he was doing—he knew to tell us: 'Damn you, don't come in here.' " The evidence authorized the finding that the defendant was not insane at the time of the criminal act, and that he was guilty of the crime as charged. The defendant made no statement.

■ The judgment, or inquisition, in the court of ordinary was that, "We do find Chester A. Murphy [the defendant in the instant case] to be a person of unsound mind and a fit subject for the Milledgeville State Hospital." (Brackets ours.) This judgment, or inquisition, is not a bar to the prosecution of the defendant for a criminal offense committed on a date either prior or subsequent thereto, for the only matter at issue before the commissioners at the time of their inquiry, is whether or not the accused was insane at that particular time. If a judgment, or inquisition, is a finding of permanent or habitual insanity (that is, sanity without lucid intervals), and the finding is made prior to the commission of the crime, the doctrine of the presumption of continuity applies, and aided by this presumption, the condition of the defendant's mind at the time of the judgment is so connected up by this presumption with the condition of his mind at the time of the commission of the crime as to make the judgment admissible evidence. But if the judgment, or inquisition, is subsequent to the commission of the crime, the doctrine of relationship back (the converse of the doctrine of the presumption of continuity) does not hold, and in such cases, a copy of the judgment, or inquisition, finding

the defendant insane, rendered a month after the commission of the crime, is not admissible. *Humphrey* v. *State,* 46 *Ga. App.* 720, 722 (169 S. E. 53) ; *Terry* v. *Buffington,* 11 *Ga.* 337, 342 (5) (56. Am. D. 423) ; *Hinkle* v. *Smith,* 133 *Ga.* 255 (65 S. E. 427) ; *Godley* v. *Barnes,* 132 *Ga.* 513 (64 S. E. 546) ; Nickols *v.* Pool, 47 N. C. 23, 28 ; Uecker *v.* Zuercher, 54 Tex. Civ. App. 289 (118 S. W. 149) ; Rowan *v.* Hodges (Tex. Civ. App.) 175 S. W. 847 ; Southern Tier Masonic Relief Ass'n *v.* Laudenbach, 5 N. Y. Supp. 901 (4). However, for the purpose of shedding light on the defendant's state of mind at the time the alleged crime was committed, evidence of his mental condition, as shown by his acts and conduct both before and after the alleged criminal act may be shown. *Martin* v. *Martin,* 185 *Ga.* 349, 352 (195 S. E. 159). If properly connected up, the defendant's condition on the very day of the inquisition, whether the inquisition was before or after the commission of the crime, may be shown by the witness or witnesses who testified at the inquisition; or by any other competent evidence that he was insane on that day.

In the instant case, the inquisition, or judgment, was a finding in a proceeding entitled: "Mrs. J. E. Murphy [the mother of the defendant] v. Chester H. Murphy." The State was not a party to this proceeding, and so far as the record shows, had no opportunity to cross-examine the witnesses or rebut their testimony, and to allow the judgment of the court of ordinary to be used as evidence would tend to the substitution of the judgment of the court of ordinary upon the facts for that of the jury who were then trying the case in the superior court. A copy of the inquisition finding the defendant insane, rendered a month after the crime was committed, was properly not admitted in evidence. Aliter, where the inquisition had adjudged the defendant "habitually insane" before the commission of the crime.

The overruling of the certiorari was not error.

*Judgment affirmed. Broyles C. J., and Gardner, J., concur.*