354

33271. DREWRY *v.* THE STATE.

DECIDED FEBRUARY 1, 1951. REHEARING DENIED FEBRUARY 21, 1951.

*Carlisle Cobb, Rupert A. Brown,* for plaintiff in error.

*D. M. Pollock, Solicitor-General,* contra.

GARDNER, Judge. 1. There was evidence tending to support the verdict. The defendant admitted shooting this woman with a pistol, but she contended: (1) that she was insane at the time of the commission of the offense charged; (2) that she was suffering at the time from "delusional" insanity; and (3) that she was justified in the shooting.

It appeared from the evidence that the defendant and John E. Drewry had been husband and wife, but were divorced and living apart at the time the defendant shot Miriam Thurmond, who later became Mrs. John E. Drewry. The defendant and her former husband had been seeing each other, and on the evening that the defendant shot this woman, John E. Drewry had had dinner with the defendant and their son, age 14 years, in the home of the defendant. Around nine o'clock or later that evening, the defendant telephoned John E. Drewry, and when he did not answer the telephone, she hurriedly dressed, placed a revolver in her pocketbook, borrowed a neighbor's automobile, and hastened to the home of Miriam Thurmond, and finding her former husband there with Miriam Thurmond

—as stated by the defendant—in a compromising situation or position, she fired the revolver at each of them, and inflicted wounds upon both him and Miriam Thurmond.

The defendant sought to show in her statement that, after the divorce between her husband and herself, she had become his wife under the common law; that there had been a marriage between them; and therefore that, when she found him with Miriam Thurmond in a compromising situation or position, she was justified in shooting the woman to prevent the commission of adultery between them. She also contended that she had become the common-law wife of her former husband and, loving him and because of his being the father of their son, she became —upon seeing them together after he had just left her with assurance of his love for her—suddenly mentally deranged and was insane at the time she fired, sought to kill, and did wound Miriam Thurmond.

The jury resolved these contentions adversely to the defendant. The evidence did not demand a finding by the jury in favor of the defendant as to either of the contentions raised by her, and the motion for new trial on the general grounds was properly overruled.

2. The court refused to give in charge to the jury the following requests: If the jury found "from the evidence, including the defendant's statement, that the defendant and John E. Drewry by agreement, in words of the present tense, to be man and wife, and being at the time capable of contracting marriage, with the intention thereby and thereupon to assume such relation, that such formal contract would be a valid marriage"; and "if you find such relationship existed between the defendant and John E. Drewry, each would have the mutual right to protect such relationship, and the shooting of a third person by one of them to prevent adultery with the other may be justified by a real or apparent necessity presented by the facts and circumstances as they appear to her at the moment of her interposition to prevent the adultery." The defendant contended that such failure was error, and says that the principles of law presented in these requests were authorized by the evidence, including the defendant's statement to the jury. Error is assigned on the refusal of the court so to charge.

It does not appear from the defendant's statement or from the evidence that Miriam Thurmond and John E. Drewry were actually engaged or about to engage in the act of sexual intercourse, which would be, if the jury found the defendant to be the common-law wife of Drewry, adultery. Unless the facts and circumstances were such, when the defendant arrived upon the scene and observed Drewry and Miriam Thurmond together, as to lead a reasonable person to suppose that the act of sexual intercourse was being committed between them, or was about to be committed between them, and that in order to prevent the consummation thereof it was necessary that she shoot the woman, the defendant would not be justifiable under the law with seeking to take the life of the offending party or parties. See *Hill* v. *State,* 64 *Ga.* 453, 467; *Mays* v. *State,* 88 *Ga.* 402 (14 S. E. 560); *Baker* v. *State,* 111 *Ga.* 142 (36 S. E. 607). What did Mrs. Drewry, the defendant, find when she came upon the scene? She said in her statement: "There were . . John E. Drewry and Miriam Thurmond; he was sitting in a low rocking chair, and she on a footstool right close in front of him. They positively were not just sitting there talking, as John reported to the press. I stood watching a long time, engaged with agonizing heartache and despair. . . Presently I found myself walking into their front door. . . I just stood there watching them nauseated, and frozen with horror." At the most, from her statement, she found John E. Drewry seated in a chair and the woman seated on a stool in front of him. Neither of them was undressed. They were in the living room of the woman's home, and her mother and grandmother were in the house. The door to the living room was not fastened. The defendant walked right in. In these circumstances—conceding that the facts authorized a finding by the jury that there existed between Drewry and the defendant a common-law marriage, that is, a marriage as defined in *Lefkoff* v. *Sicro,* 189 *Ga.* 554 (6 S. E. 2d, 687, 133 A. L. R. 738), and that this relationship authorized an application of the provisions of Code, § 26-1016, and the sections therein referred to, and would have justified, in a proper case, the shooting by the defendant of Miss Thurmond—this court is of the opinion that the evidence, including the defendant's statement, did not authorize a finding that such urgency and necessity existed as to justify the defendant in the shooting.

It follows that the court did not err in failing to charge the jury as requested by the defendant, based on her statement only.

3. In the second special ground, the defendant insists that the court should have granted a mistrial, upon timely motion of her counsel, because—during a colloquy between the court and counsel for both sides, occurring during the examination of a witness as to the defendant's mental state while in the hospital immediately following the shooting of Miss Thurmond, and as she appeared at the time of the trial, and as to her probable condition at the time of the shooting, where the defendant's counsel was endeavoring to show that she was, at the time she shot Miss Thurmond, in such a state as to be insane or suffering from what is known as "delusional" insanity—the solicitor stated "I submit that there is no such thing as 'temporary' insanity in Georgia," and the trial judge, in the presence of the jury, stated: "I have never heard of it, but I am not an expert. Is there any definition of law as to temporary insanity?" At this point the defendant's counsel asked that the jury retire, and moved for a mistrial, which the court denied.

The trial judge made no statement that there was not in this State such a thing as "temporary" insanity, but simply stated that he was not an expert and had never heard of it. Our law deals with delusional insanity as a defense and as the only exception to insanity generally, but it is not referred to as "temporary" insanity. The contention is that a person may become, due to the facts and circumstances and mental condition of that person, temporarily insane and while so temporarily insane may commit an offense, and as a result thereof commit an offense for which such person would not be legally responsible. In this State, it has been held that "No cognizance is taken of what has been termed 'impulsive' or 'emotional' insanity, where a criminal act is done under some overwhelming and irresistible impulse, unless it be that such impulse is the result of a mental disease or mental defect, overriding reason and judgment and obliterating the sense of right and wrong so as to fall within the generally accepted 'right and wrong test', or the exception, above referred to, of 'delusional insanity'." *Rozier* v. *State*, 185 *Ga.* 317, 320 (195 S. E. 172), citing *Brinkley* v. *State*, 58 *Ga.* 296, 390; 16 C. J. 100-103; 32 C. J. 599-601. The court stated

that delusional insanity was where, although a man had sufficient reason to distinguish between right and wrong, yet if, in consequence of some delusion, his will is overmastered and there is no criminal intent, he is not responsible, where the act itself is connected with the peculiar delusion under which the man is laboring. *Rozier* v. *State*, supra, citing *Hargroves* v. *State*, 179 *Ga.* 722(3) (177 S. E. 561), and Code § 26-301. We do not think that the remark of the trial judge here demanded that a mistrial be awarded to the defendant in order to prevent injustice being done and to insure that the defendant have a fair and impartial trial; and therefore the court did not err in overruling the motion for a mistrial, under the entire charge. The facts here, at most, showed that the defendant was laboring under an overwhelming and irresistible emotional impulse, brought about by seeing Drewry and Miss Thurmond together, when she had entertained hopes that her former husband, the father of her child, and she would become reconciled, or was under the impression that they had become reconciled. It does not appear that this impulse was the result of any mental disease or defect, which had the effect of overriding her reason and obliterating her sense of right and wrong.

It is true that insanity will excuse a crime. If a person is insane when she commits a crime and later becomes sane, such person would not in a proper case be responsible for the offense committed while insane. In this case, there could be a temporary insanity as distinguished from a permanent insanity, but this is not the kind of temporary insanity referred to.

We have carefully examined the authorities cited by counsel for the defendant, and find nothing therein contrary to what is here ruled. This is not a case where there is an effort to reduce an offense from murder to manslaughter. In such a case, the fact that the accused person, by reason of the facts, killed under an irresistible impulse would in a proper situation be considered by a jury. The jury in a proper case might have then found a verdict of manslaughter and reduced the offense. But here the offense was assault with intent to murder, and the issue here was whether there was an assault with intent to kill or a justfiable assault.

It might very properly be kept in mind, and the jury had a

right to believe that the defendant did not act on any impulse which was aroused by having seen anything wrong between Miss Thurmond and John E. Drewry after she arrived on the scene, but that she did, with premeditation and malice, arm herself, borrow an automobile, and go to the home of Miss Thurmond for the purpose of taking both the lives of Miss Thurmond and John E. Drewry, if she found Drewry there.

3. It follows from what is held in the preceding division of this opinion that the court did not err in charging the jury that "the laws of Georgia do not recognize what is called temporary or emotional insanity," and instructing them as to the principle quoted hereinabove from the *Rozier* case, supra. In this ground (third special ground) the defendant assigns as error a lengthy excerpt from the charge of the court, the greater portion of which is admittedly sound law, and only that portion thereof dealing with insanity as relates to temporary or emotional insanity and to delusional insanity is charged as error. This instruction, in view of the entire charge of the court, is not error for the reasons assigned, and follows the *Rozier* case, supra.

4. In the fourth special ground the defendant assigns as error the following excerpt from the charge of the court: "The laws of Georgia do not recognize what is called temporary or emotional insanity. The insanity which the law recognizes as an excuse for crime must be such as dethrones reason and incapacitates an individual from distinguishing between right and wrong as to the *consequences* of his or her conduct, or, where a person has sufficient reason to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of some delusion, his or her will, is overmastered and there is no criminal intent, provided the act itself is connected with the peculiar delusion under which the accused is laboring. Now, if you find from the testimony submitted on the trial of this case, by a preponderance of evidence, that the defendant, at the time [the assault] was committed, in consequence of some delusion in connection with the act, her will was overmastered, you should acquit the defendant, provided the delusion, if true, would justify the act."

There was no error in the charge assigned as error in this special ground. Under the ruling of the Supreme Court in

*Rozier* v. *State* (supra), page 320, this charge stated the substance of what was held in division two of the opinion in that case. It was not error, in that therein the court stated, "provided the delusion, if true, would justify the act," and thereby placed an undue burden upon the defendant not warranted by the facts. This excerpt was substantially in the language of the Supreme Court ruling and, in view of the entire charge, was correct.

5. No error of law appears, and there being evidence to support the verdict rendered, the trial judge did not err in overruling the defendant's motion for new trial.

*Judgment affirmed. Sutton, C.J., MacIntyre, P.J., and Worrill, J., concur. Felton and Townsend, JJ., dissent.*

Townsend, Judge, dissenting. Although the defendant at the beginning of the trial sought to rely, in addition to the defense of insanity at the time of the commission of the act, on the further defense of justification, because, according to her contention, at the time of the commission of the act a common-law marriage existed between John Drewry and herself, and because the shooting was necessary to prevent an act of adultery from being committed between him and the prosecutrix in violation of their common-law marital relationship—it developed subsequently that, because there was no evidence, including the statement of the defendant, that any act of adultery was about to be committed, this defense became unavailable to her. It follows that the only defense she has is that of insanity at the time of the commission of the act, whether general or delusional in character. Therefore, her defense of insanity, being her only one, should have been treated with legal precision and reasonable exactitude. There was some evidence that would have authorized the jury to have found that the defendant was suffering from some form of insanity, whether general or delusional, at the time she procured the pistol, got in the automobile, and proceeded to the home of the prosecutrix and fired the shots for which she was on trial, which affected her to the extent that she did not have sufficient mind and understanding to distinguish between right and wrong as to the consequences of her acts and conduct, or that the mind of the defendant was so affected by mental disease at the time that her will power

was impaired, and that she was thus robbed of the power to choose between right and wrong, or that the defendant committed the act in consequence of some delusion by which her will was overmastered. The trial judge recognized that these elements of law were authorized by the evidence because he gave these principles in charge.

Special ground 5 complains that the trial court erred in failing to declare a mistrial, because of his remark in the presence of the jury to the effect that he had never heard of temporary insanity. The proceedings leading up to this remark were as follows: Mrs. Heery, a witness for the defense, was on the stand, and to the question of counsel for the defendant on direct examination, that "You mean she was practically temporarily insane at that time—is that what you mean?" the solicitor-general remarked, "Now, Your Honor, I submit that there is no such thing as temporary insanity in Georgia," to which the court replied: "I have never heard of it. But I am not an expert. Is there any definition of law as to temporary insanity?"

At this point counsel for the defendant requested that the jury retire and, upon this being done, moved for a mistrial on the ground that the court, in expressing an opinion on this issue, had become a witness before the jury. The court then stated: "Mr. Cobb, I am going to instruct this jury that there is no such thing as temporary insanity under the laws of Georgia, and that they cannot consider any such as a defense." Upon further colloquy, counsel for the defendant contended that insanity at the time of the commission of the act is the test laid down, and that such insanity might well be temporary. Upon the return of the jury the court then stated, "Before taking up the testimony, that remark about 'under the laws of Georgia temporary insanity was not recognized'—I again state to you that it is not recognized as a defense under our Georgia laws. I want it to be very carefully understood that it was not any attempt on the part of the court to express an opinion of the defendant's mind. If you have any idea of that, simply erase it from your mind. The court wasn't attempting to express any opinion of the condition of this defendant's mind, but simply telling counsel as a defense there is no defense of temporary insanity. Now, if any question of a defense of insanity or delusional in-

sanity comes up in this case, then I will properly charge you when the time comes to do that."

Thereafter, the court charged the jury as complained of in special ground 7 as follows: The laws of Georgia do not recognize what is called temporary or emotional insanity. The insanity which the law recognizes as an excuse for crime must be such as dethrones reason and incapacitates an individual from distinguishing between right and wrong as to the consequence of his or her conduct, or where a person has sufficient reason to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of some delusion, his or her will is overmastered and there is no criminal intent, provided the act itself is connected with the peculiar delusion under which the accused is laboring. Now, if you find from the testimony submitted on the trial of this case, by a preponderance of evidence, that the defendant, at the time the act was committed, in consequence of some delusion in connection with the act, her will was overmastered you should acquit the defendant; provided the delusion, if true, would justify the act."

Again, when the jury after deliberating for some time returned to the courtroom and asked for an additional charge on the subject of delusional insanity, the court repeated the charge above set out.

The evidence is undisputed: that John Drewry had, for most of the time since the divorce between the defendant and himself, been visiting in the home of the defendant; that he had spent some nights there, and that he spent the previous Thanksgiving weekend there; that he was in the home of the defendant the evening of the shooting; that he took her and their son to dinner at some roadside restaurant that evening; that, upon returning to the home of the defendant, Drewry left early because of the defendant's illness; that on this evening he kissed the defendant both on arriving at her home and upon leaving it; that in walking away he waved to her; that, upon arriving at his apartment, he telephoned to thank her for a "lovely evening," and told her he was going to bed; and that immediately thereafter he went to the home of the prosecutrix. According to the statement of the defendant—after he left, she took some medicine and a bath; then, feeling better, called him to tell him she had improved;

she was informed that her former husband had gone to a certain drug store; she knew that this drug store was closed and he knew it, they having passed it earlier in the evening; thereupon, overcome by the certainty that his entire course of action with her was false and deceitful, and that he had left her for the purpose of going to see the prosecutrix, she procured the pistol and the automobile and went to the latter's home, where she in fact found her former husband sitting in the living room with the prosecutrix on a footstool at his feet. The evidence is also undisputed: that several years previous to this occasion the prosecutrix was employed as the secretary of Drewry, who was and is Dean of the School of Journalism at the University of Georgia; that the defendant became suspicious that improper conduct and relationship existed between them; that after great difficulty she succeeded in getting the prosecutrix removed from her husband's office; that Dean Drewry thereafter on several occasions sought to bring about an agreement on the part of the defendant to allow him to return the prosecutrix to his office as his secretary; that these efforts were made by Drewry not only in discussions about the matter with his wife but with several other people; but that the defendant steadfastly refused to agree to the return of the prosecutrix to the office of her husband.

It is the contention of the defendant that the continued association of her husband with the prosecutrix, after she left his office as his secretary, resulted in the breaking up of her home and brought about their divorce; but that, after the divorce became final, the attentions showered upon her by her former husband caused her to feel secure in her conviction that she had won him back; that 'phoning his apartment on the night of the shooting and finding that he had misrepresented his whereabouts caused the loss of that security; and that this brought about such a distinct shock to her that she became temporarily dethroned of her reason to the extent that either she could not distinguish between right and wrong or that she was shorn of her will power to choose between right and wrong in her actions; and that therefore she was suffering from insanity at the time of the commission of the act.

In charging that Georgia does not recognize "temporary or

emotional insanity," the court was obviously confused by technical terminology, and meant to indicate that Georgia does not recognize the doctrine sometimes also referred to as "partial insanity," or "irresistible impulse" (analogous to that heat of passion necessary in manslaughter cases) recognized in some jurisdictions. See 22 C. J. S., Criminal Law, §§ 60, 61; Boyle v. State, 229 Ala. 212 (154 So. 575); People v. Varecha, 353 Ill. 52 (186 N. E. 607); People v. Geary, 298 Ill. 236 (131 N. E. 652); Morgan v. State, 190 Ind. 411 (130 N. E. 528); State v. Green, 78 Utah 580 (6 Pac. 2d, 177). This line of decisions is not followed in Georgia. See Barker v. State, 188 Ga. 332 (3) (4 S. E. 2d, 31); Rozier v. State, 185 Ga. 317. The latter case contains the statement, "In this and most of the States, no cognizance is taken of what has been termed 'impulsive' or 'emotional' insanity, where a criminal act is done under some overwhelming and irresistible impulse." It appears to be on the basis of this case that the judge worded the charges and instructions as he did; and had he followed the context and said "impulsive or emotional insanity," it would have been a correct charge. What he actually said, and re-emphasized at four different stages during the trial, was "temporary or emotional insanity" or just "temporary insanity", which, to the jurors at least, was a very different thing. Temporary, as defined in Webster's International Dictionary, means "lasting for a time only, existing or continuing for a limited time; not permanent; ephemeral; transitory." Code § 26-303 requires only that the defendant prove insanity at the time the act was committed. It is not necessary that the insanity continue to the time of the trial. Murphy v. State, 70 Ga. App. 387 (1) (28 S. E. 2d, 198). Nor is it necessary that it have had any particular duration prior to or subsequently to the act. Therefore, in the usual and well-defined meaning of the word, the insanity which will prove a valid defense may or may not be temporary, but the fact that it is temporary does not lessen its value as a defense. It is true that, except in certain psychotic conditions, the "emotional or impulsive insanity" is usually temporary, but this is not to say that all insanity which is temporary is of this nature. If that were true, there would be no need for the entire field of mental and psychiatric therapy, which we have seen work

amazing results during and since the last war, in all types of shock cases resulting in mental derangement. As early as 1847, at a time not known for its understanding or care of mental abnormalities, Judge Nisbet, in *Roberts* v. *State*, 3 *Ga.* 310, 328, stated: "Whether a man is sane or not, whether partially or totally deranged, and if only in part deranged, where accountability to the laws shall begin, and where end, are questions of great and embarrassing subtlety. The laws of the sane mind are but little understood; much less are the laws, if indeed such phraseology is predicable of it, of the unsound mind understood. We can judge of the one by external developments and by our own consciousness; of the other, only by external indicia."

By his charge the judge planted in the jury's mind the external indicia by which they were to determine the issue of insanity—that is, that it could not be temporary in character. From this the jury could only conclude that, unless it was permanent, there was no insanity. This is not what our Code says, nor is it the meaning of the law. By ruling in effect that the insanity could not be temporary in character, the court stripped the defendant of her only defense, for the evidence demanded a finding by the jury that from whatever insanity she was suffering, if any, whether general or delusional, it was temporary.

While the law of Georgia does not define any particular insanity as "temporary," and while the appellate courts of this State seem not to have ever referred to any insanity by this term, nevertheless, if a defendant at the time of the commission of an act, otherwise criminal, is suffering from a form of insanity that meets the requirements of law as a defense, the fact that it is "temporary" in no way minimizes its value as such. The fact, therefore, that counsel for the defendant so referred to the alleged insanity of his client, and the fact that the witness for the defendant so characterized it, in no way rob it of its validity.

I do not think that the trial court erred in refusing to declare a mistrial, as complained of in ground 5 of the amended motion for a new trial; but, taking into consideration what transpired as set out in this amended motion, I think that the charge of the court on temporary insanity, as set out in ground 7, con-

366

stitutes harmful error. Nor does the fact that the court other-
wise properly and fully charged on the defense of insanity cor-
rect it, because in my opinion the jury was probably confused
by the erroneous part in its effort to do the impossible and
reconcile that part with the correct part of the court's charge
on this subject. I therefore think that the trial court erred in
overruling the motion for a new trial.

*Felton, J., concurs in this dissent.*