321 Ga. 597
FINAL COPY

S24G1299. THE STATE v. WIERSON.

PINSON, Justice.

Michelle Wierson was charged with vehicular homicide after she allegedly caused a fatal car accident while speeding. Before trial, two psychiatrists concluded that, at the time of the accident, Wierson lacked the mental capacity to tell right from wrong and suffered from a delusional compulsion that caused her to speed. Relying on those conclusions, Wierson filed notice of an intent to plead not guilty by reason of insanity. The State then moved to introduce evidence that, a few weeks before the accident, Wierson stopped taking some of her psychiatric medications. The trial court granted the State's motion, but the Court of Appeals reversed in a pre-trial appeal, holding that evidence of medication non-compliance is not relevant to whether the statutory defenses of insanity are available to a defendant. We granted review to address that question, and also to reconsider *Bailey v. State*, 249 Ga. 535 (291 SE2d 704) (1982),

which held that those statutory defenses are not available to a defendant who brought about the relevant mental state "intentionally" or "voluntarily."

1. *Background*

(a) Wierson was charged with homicide by vehicle and reckless driving after she allegedly drove at high speed and struck another car, killing a passenger in the other car. Wierson had before been diagnosed with bipolar disorder, and at the jail after her arrest, she was described as being in a "manic state . . . exhibiting multiple symptoms of bipolar manic episodes." She was soon released on bond to a mental-health facility for treatment and evaluation. The doctor who saw her there noted that Wierson's prescribed treatment for her condition included at least four medications. But there was evidence that Wierson had stopped taking at least three of those medications several weeks before the accident.

After her release from the facility, Wierson was examined by two more psychiatrists, one hired by the defense and the other appointed by the court. The two psychiatrists concluded that, on the

2

day of the accident, Wierson was under a delusion that God had told her that her daughter's life was in danger, that it was God's will that she rush to rescue her daughter, and that God was driving her car. The psychiatrists agreed that, because of that delusion, Wierson was not able to distinguish right from wrong and was suffering from a delusional compulsion that overmastered her will to resist committing the alleged offense.

Based on the psychiatrists' conclusions, Wierson filed a notice of intention to plead not guilty by reason of insanity. Under the Georgia Code, a defendant can be found not guilty by reason of insanity if she qualifies for either of two statutory defenses, which we will refer to collectively as the "insanity-defense statutes."[1] The first, which is based on "mental incapacity," provides:

> A person shall be found not guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have the mental capacity to distinguish between right and wrong in relation to such

---

[1] We use this term although the statutes themselves do not use the word "insanity," because the Code provides elsewhere that a person who "meet[s] the criteria" of these statutes is considered "[i]nsane at the time of the crime." See OCGA § 17-7-131 (a) (1).

act, omission, or negligence.

OCGA § 16-3-2. The other defense, which is based on a "delusional compulsion," provides:

> A person shall be found not guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.

OCGA § 16-3-3. As noted above, Wierson's psychiatrists found both that she was not able to distinguish right from wrong and that she suffered from a delusional compulsion, so her plea invoked both insanity-defense statutes.

The State responded to Wierson's insanity plea with a motion in limine to admit evidence that Wierson had stopped taking at least some of her prescribed medications. The State argued that if Wierson planned to mount an insanity defense, the jury should hear evidence that Wierson had voluntarily contributed to her mental state, "just as if the issue were voluntary intoxication or other voluntary incapacitation." Wierson countered with a motion in limine to exclude any evidence of "medication non-compliance." She contended

4

that the only question relevant to an insanity defense is whether the defendant was under the relevant mental state at the time of the alleged offense.

(b) The trial court granted the State's motion to introduce evidence of medication non-compliance. The court explained that the question was novel in Georgia law. But it concluded that evidence of medication non-compliance was relevant to Wierson's insanity defense, and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

In an appeal before trial, the Court of Appeals reversed. See *Wierson v. State*, 372 Ga. App. 102 (903 SE2d 792) (2024).[2] The court held that evidence of medication non-compliance should have been

---

[2] The Court of Appeals' decision resolved two consolidated appeals: Wierson's appeal of the trial court's medication non-compliance order, which is the subject of this opinion (Case No. A24A0241), and the State's cross-appeal from a separate trial court order that had declined to prevent Wierson from asserting the insanity defense at all (Case No. A24A0242). See *Wierson*, 372 Ga. App. at 104. In the latter appeal, the Court of Appeals unanimously affirmed the trial court's order and concluded that Wierson could assert the insanity defense. See id. at 112-113 (3). We did not grant review of the court's judgment in that appeal, and it is not addressed by this opinion.

excluded because it was not relevant. See OCGA § 24-4-402 ("Evidence which is not relevant shall not be admissible."). As to the insanity defenses, the court explained that the insanity-defense statutes make no mention of how or why a defendant may have come to her mental state, but say only that she is not guilty if she has that mental state at the time of the offense. See *Wierson*, 372 Ga. App. at 105 (1) (a). The court then reasoned: "To conclude that a defendant may still be found guilty of a crime if her mental incapacity or delusional compulsion can be attributed to medication noncompliance would be to write an exception into the statutes, which this Court is not authorized to do." Id. at 107 (1) (a). The court therefore held that Wierson's failure to take her medication was not relevant to her insanity defenses.

Separately, the court held that evidence of medication noncompliance was not relevant to show Wierson's intent to commit vehicular homicide and reckless driving — an argument that the State made for the first time on appeal. *Wierson*, 372 Ga. App. at 105 (1) (a), 111 (1) (b). The court reasoned that the charged offenses did not

require the State to prove that Wierson intended to speed or to drive recklessly, but only that she voluntarily committed the act that the statute prohibits, so it did not matter whether she believed she was justified in doing so. See id. at 111 (1) (b).

The Court of Appeals then addressed the authority that the State relied on, most notably *Bailey*, 249 Ga. 535. *Bailey* involved a paranoid schizophrenic who, against his doctor's advice, voluntarily entered a highly stressful situation, and then "overreacted" and killed two people. *Bailey*, 249 Ga. at 536-537 (1). This Court concluded in *Bailey* that a "delusional compulsion" defense was not "available" to the defendant because, even if he was suffering from such a delusion, he had "brought that delusion about" voluntarily. Id. at 537-538 (1). In this case, the State relied on *Bailey* and argued that Wierson similarly "brought [her] delusion about" by not taking her medication. But the Court of Appeals majority concluded that *Bailey* did not control because its holding was limited to its facts: "The holding in *Bailey* was simply that the particular facts of that

case did not justify a jury charge on delusional compulsion." *Wierson*, 372 Ga. App. at 108-109 (1) (a).

Judge Padgett dissented. The dissent agreed with the majority that the insanity-defense statutes do not create an exception for medication non-compliance or other self-inducement. See *Wierson*, 372 Ga. App. at 114. But the dissent believed that this case was controlled by *Bailey*, which recognized an exception to the insanity-defense statutes that applied to this case. See id. at 114-115.

We granted review to determine (1) whether evidence that a defendant voluntarily contributed to her mental state at the time of the crime is relevant to whether the statutory insanity defenses are available, and (2) whether *Bailey* should be reconsidered.

2. *Analysis*

(a) *The Insanity-Defense Statutes*

To start, let's put aside *Bailey* for the moment and consider the statutory insanity defenses on their own. When we interpret a statute, we give the text its "plain and ordinary meaning" at the time it was enacted, *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d

8

337) (2013) (citation and punctuation omitted), and we find that meaning by reading the relevant language "in its most natural and reasonable way, as an ordinary speaker of the English language would," *State v. Islam*, 321 Ga. 30, 32 (912 SE2d 632) (2025) (citation and punctuation omitted). To that end, we must consider the text not by itself, but in the "context in which it appears," id. (citation and punctuation omitted), including the surrounding statutory language, the statute's structure and history, and other law that makes up the legal backdrop against which the language was enacted. See *State v. Harris*, 319 Ga. 665, 667 (906 SE2d 402) (2024). We also have a set of rules and presumptions to help us identify the most reasonable meaning from among the possible meanings. Among these canons of construction, we have said that we generally should avoid a construction that would make some statutory language "mere surplusage," *Middleton v. State*, 309 Ga. 337, 342 (3) (846 SE2d 73) (2020) (citation and punctuation omitted). And, just as important — and it should go without saying — we may not read into a statute language that the General Assembly did not enact. See,

9

e.g., *White v. State*, 305 Ga. 111, 118 (2) (823 SE2d 794) (2019) (court "was not authorized to write a 'relevance' exception into" the Rape Shield Statute); *Luangkhot v. State*, 292 Ga. 423, 427 (4) (736 SE2d 397) (2013) (declining to construe language in wiretap statute that grants superior courts the general authority to issue investigative warrants as granting courts the broad authority to authorize wiretaps outside their judicial circuits, because "[i]f our legislature had intended to grant superior courts" that broad authority, "it could have done so explicitly").

With those principles in mind, we turn to the statutory insanity defenses. The plain language of those statutes says that a defendant is not guilty if, "at the time of the act, omission, or negligence constituting the crime," she lacked the mental capacity to distinguish right from wrong or was under a delusional compulsion that made her unable to resist committing the crime. OCGA §§ 16-3-2 & 16-3-3. Neither statute provides any exception to when these defenses are available. They do not say anything about the *cause* of the defendant's mental state at the time of her "act, omission, or

10

negligence." And they do not say that the insanity defenses do not apply if the defendant helped bring about her own mental state, nor do they consider the defendant's mental state *before* the crime. Put simply, the plain language of the insanity-defense statutes gives not even a hint that these defenses would not be available to a person who has "brought about" the relevant mental state voluntarily, whether by not taking medication or otherwise.

The absence of any such language is especially notable when the insanity-defense statutes are considered in their relevant context. See *Harris*, 319 Ga. at 667. Those statutes are part of Article 1 of Chapter 3 of Title 16 of the Georgia Code, which deals with "Defenses to Criminal Prosecutions" that are based on the defendant's "Responsibility." Within Article 1, the Code section right next door to the insanity-defense statutes establishes a defense based on the defendant's intoxication. See OCGA § 16-3-4. That intoxication-defense statute uses language that tracks the insanity-defense statutes: "A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person,

11

because of involuntary intoxication, did not have sufficient mental capacity to distinguish between right and wrong in relation to such act." OCGA § 16-3-4 (a). But notably, quite unlike the insanity-defense statutes, the intoxication-defense statute goes on to include an exception to the defense in a separate subsection: "Voluntary intoxication shall not be an excuse for any criminal act or omission." OCGA § 16-3-4 (c). By including that explicit exception, the intoxication-defense statute enacts the General Assembly's judgment that, *in some cases*, a defendant who bears some responsibility for her own mental state may not avail herself of a mental-state defense. It shows that the General Assembly knows how to carve out that kind of exception. Yet the General Assembly did not do so for the insanity defenses. Generally, when two statutes deal with the same subject matter, are grouped together, and use largely the same language, but one includes an additional provision that the other does not, this is strong evidence that the omission was intentional. See *Mooney v. Webster*, 300 Ga. 283, 288-289 (794 SE2d 31) (2016) ("This Court is mindful of the long-recognized doctrine of statutory

construction, *expressio unius est exclusio alterius*, which discourages judicial recognition of exceptions not specifically set forth in a legislative enactment when other exceptions are expressly stated." (emphasis added)); *Allen v. Wright*, 282 Ga. 9, 13-14 (3) (644 SE2d 814) (2007) (noting that when interpreting statutes, the express inclusion of one thing gives rise to an inference that those omitted were intended to be excluded).

If that were not evidence enough that these statutes do not take away a person's insanity defense if someone "brings about" those mental states "voluntarily," consider the legal backdrop against which these statutes were enacted. See *Summerlin v. Ga. Pines Cmty. Serv. Bd.*, 286 Ga. 593, 594 (2) (690 SE2d 401) (2010) ("The General Assembly is presumed to enact all statutes with full knowledge of the existing condition of the law and with reference to it."). These statutes were enacted in their current form in 1969. See Ga. L. 1968, pp. 1250, 1270, § 1 and Compiler's Note. Before that, their predecessor statute also provided a legal defense for those

without mental capacity (though the old law used the terms "lunatic" and "person insane"). The old law, which goes back to at least 1817 (when it was first codified), distinguished between a defendant's periods of "lunacy or insanity," on the one hand, and what it called "lucid intervals," on the other, and it made clear that the defendant was culpable only for acts committed during the lucid intervals:

> A lunatic or person insane, without lucid intervals, shall not be found guilty of any crime or misdemeanor with which he may be charged, provided the act so charged as criminal *was committed in the condition of such lunacy or insanity*; but if a lunatic has lucid intervals of understanding, he shall answer for *what he does in those intervals* as if he had no deficiency.

Code Ann. 1933 § 26-303 (emphasis added). See also, e.g., Code Ann. 1882 § 4296; Code Ann. 1860 § 4192; Penal Code of 1817, Div. I, Sec. V (Ga. L. 1816, p. 143). Like the current statutes, the former law was explicit that the key question was the defendant's mental capacity *at the time of the crime*. And the decisional law applying those old Code sections likewise focused on the defendant's mental capacity at the time of the crime, without regard to how it came about.

14

See, e.g., *Clark v. State*, 167 Ga. 341, 346 (145 SE 647) (1928) (trial court correctly instructed the jury that the defendant would "not be excusable . . . on the ground of mental disease or insanity" if he "committed the act charged against him . . . and . . . at the time of the commission he was not mentally incapable of distinguishing between right and wrong"); *Baughn v. State*, 100 Ga. 554, 556 (28 SE 68) (1897) ("under the law of this State no person can be legally convicted of a crime committed while in a moment of irresponsibility growing out of an unsound mind"); *Orange v. State*, 77 Ga. App. 36, 40 (2) (47 SE2d 756) (1948) (although the defendant had been adjudged insane before the crime, it was up to the jury to decide "whether he was insane at the time of the commission of the crime"); *Murphy v. State*, 70 Ga. App. 387, 389-390 (28 SE2d 198) (1943) ("the only matter at issue, before the commissioners at the time of their inquiry, is whether or not the accused was insane at that particular time" of the offense, although evidence of the defendant's acts before and after the offense may be relevant "for the purpose of shedding light on the defendant's state of mind at the time the alleged crime

15

was committed"). All of which is to say that, for more than a century before our current insanity-defense statutes were enacted, Georgia law has recognized similar defenses, and yet it never mentioned whether the person induced her lack of mental capacity as even a relevant consideration, much less an exception to this longstanding defense.

The State points out that certain Court of Appeals decisions have generally authorized juries to consider evidence of the defendant's actions and mental state *before* the crime. But those decisions merely held that evidence of the defendant's behavior before the crime (and during and after the crime) could be relevant to the question of whether the defendant in fact had the relevant mental state "at the time of" the incident — whether lacking the mental capacity to tell right from wrong or under a delusional compulsion. See, e.g., *Wilson v. State*, 9 Ga. App. 274, 281 (70 SE 1128) (1911) ("*Whether an act was caused by a diseased mind is to be determined primarily from the indicia presented by the act itself, and then from the results of an examination of the physical, moral, and mental condition of

16

the accused before, at, and after the act in question." (emphasis added)); *Murphy*, 70 Ga. App. at 389-390. In other words, a jury could always consider evidence from before the crime to determine the defendant's mental state "at the time of the act, omission, or negligence constituting the crime." But none of those decisions held that *how* that mental state came about — whether "voluntarily" or otherwise — mattered to whether these defenses were available. So those decisions are consistent with the straightforward conclusion that these statutes do not make the defenses unavailable to a person who "brought about" the relevant mental state.

In short, the plain language of these statutes, their context, and their long history all align: the insanity defenses are available even to a person who has "voluntarily" induced the relevant mental state. And applied to this case, that would mean that whether Wierson stopped taking her medication some weeks before the accident is not relevant to whether the statutory insanity defenses are available to her.

(b) *Reconsidering* Bailey v. State

But we cannot stop there. As we mentioned earlier, one of our decisions, *Bailey*, is in conflict with this otherwise straightforward conclusion that the insanity-defense statutes do not make the defenses unavailable to a person who voluntarily induced the relevant mental state before the crime at issue was committed. That conflict was highlighted by the Court of Appeals below: the majority distinguished *Bailey* and held that its exception did not apply to Wierson's medication non-compliance, while the dissent would have held that *Bailey* controlled, making the insanity defenses unavailable in this case. So we turn to *Bailey* now, addressing first the disagreement below about whether it controls this case, and then whether it should be reconsidered.

(i) *Bailey* involved a defendant with paranoid schizophrenia who, against his doctor's orders, put himself into a highly stressful situation and ultimately killed two people. *Bailey*, 249 Ga. at 537-538 (1). Bailey contended that he shot the victims while suffering under a delusional compulsion, see id. at 536 (1), and so he tried to

invoke the statutory delusional-compulsion defense. But the trial court refused to sustain that plea or to instruct the jury about the statutory defense of delusional compulsion. Id. at 536-537 (1).

This Court affirmed that decision. In doing so, we acknowledged that, under our precedent, the statutory defense of delusional compulsion is available if there is evidence "that the defendant was laboring under a delusion, that the act itself was connected with the delusion and furthermore that the delusion would, if true, justify the act." *Bailey*, 249 Ga. at 537 (1) (citation and punctuation omitted). But then we took another step: without reasoning or precedent in support, we declared that the "necessary implication" of the insanity-defense statutes was that "a chronic paranoid schizophrenic may no more voluntarily and intentionally induce his delusion than a chronic alcoholic voluntarily may induce his drunkenness then expect the homicide to be excused rather than criminal." Id. (citing Code Ann. 1933 § 26-704, predecessor to OCGA § 16-3-4, the intoxication-defense statute). And so we concluded that, even if Bailey had

suffered from a delusion that "properly would invoke" the delusional-compulsion defense, the defense was not available to him because he "brought that delusion about with as much premeditation as a chronic alcoholic who, in the same circumstances, might have prepared himself for the impending confrontation by imbibing alcohol to excess." Id. at 538 (1).

(ii) The question whether a precedent controls a decision in a later case turns on the scope of the relevant holding of that precedent. In a system of precedent, courts are bound to stick to and apply our past decisions rather than deciding each case on a blank slate. See *Wasserman v. Franklin County*, 320 Ga. 624, 645 (II) (B) (1) (911 SE2d 583) (2025). Courts "apply" those past decisions by discerning the reasoning that was necessary to their outcomes and using the same reasoning (often distilled into rules of decision or legal principles, standards, or tests) in the cases before them. That reasoning that was necessary to the past decision is, speaking generally, its holding. See *Holding*, Black's Law Dictionary (12th ed. 2024) ("[a] court's determination of a matter of law pivotal to its decision; a

20

principle drawn from such a decision"); Bryan A. Garner et al., The Law of Judicial Precedent 44 (2016) (defining a holding as "the parts of a decision that focus on the legal questions actually presented to and decided by the court"). So, when we ask whether a precedent "controls" in a case before us, what we are really asking is whether any holding in a past decision would require a particular outcome if applied to the facts of the case before us.

Pinpointing the holding of a past decision is more art than science. There exists a range of views on how to define a holding as a general matter. See Garner at 45-46 (discussing how "commentators and judges don't uniformly define what counts as a holding"). And even if we can agree to define a holding generally as the reasoning necessary to a decision, figuring out what reasoning is truly "necessary" can be tricky, particularly when the reasoning set out in an opinion is wide-ranging (which parts were really necessary?) or ambiguous (what exactly was the reasoning?) or even implicit (what were they thinking?). One judge's holding may be another's dicta. Compare, e.g., *Smith v. State*, 236 Ga. 5, 10 (6) (222 SE2d 357) (1976)

(saying that the Court "held" in *State v. Stonaker*, 236 Ga. 1 (222 SE2d 354) (1976), that it is not error for the trial court to fail to instruct the jury on a lesser-included offense in the absence of a written request), with *Wipfel v. State*, 320 Ga. 84, 88 (2) (a) (907 SE2d 639) (2024) (describing the same legal principle from *Stonaker* as "necessarily dicta").

But one point of relative agreement is that a holding must be something more than the result of the case given its precise facts. See *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (II) (B) (116 SCt 1114, 134 LE2d 252) (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). Were it otherwise — if the only binding feature of past decisions was that their particular result is mandated given an identical set of facts — no precedent would be truly binding on future courts and litigants. After all, no two cases are precisely the same, and the universe of factual circumstances is infinite. And indeed, when courts "distinguish" past precedents, they do not look for just any facts that are different from

the case before them, but rather for circumstances relevant to, and which place the current case outside of, the rule of decision of the precedent in question. See, e.g., *Holmes v. State*, 318 Ga. 213, 222-223 (2) (b) (ii) (897 SE2d 829) (2024) (distinguishing precedent holding that the Fifth and Sixth Amendments to the United States Constitution prohibit the State from introducing a psychiatrist's testimony from an earlier competency-to-stand-trial hearing at the penalty phase of a death-penalty trial to support future dangerousness, because, in the case before the Court — and unlike in the precedent decision — the defendant "put his mental condition at issue" by claiming an insanity defense); *Ga. CVS Pharmacy, LLC v. Carmichael*, 316 Ga. 718, 743 (IV) n.18 (890 SE2d 209) (2023) (distinguishing cases concerning foreseeability in the context of proximate cause as not controlling on question of foreseeability in the context of the duty of care, because the two kinds of foreseeability are "distinct"); *Jackson v. State*, 306 Ga. 266, 274 (5) (a) (830 SE2d 99) (2019) (distinguishing precedent concerning Georgia's constitutional protection against self-incrimination because those cases did not address

23

question before the Court of whether the State can elicit testimony that the defendant failed to come forward to the police with information about the crime). So although we do not purport here to set out a precise definition of a holding, we can safely say that the holding of a judicial decision is more than just its result on a given set of facts — it includes, to some degree, the reasoning or principles that were necessary to that decision.

This is where the Court of Appeals went wrong in reading *Bailey*. The court concluded that *Bailey* did not control the decision whether one of the insanity defenses was available to Wierson here because "[t]he holding in *Bailey* was simply that the particular facts of that case did not justify a jury charge on delusional compulsion." *Wierson*, 372 Ga. App. at 108-109 (1) (a). As we just explained, that "facts plus result" view of a holding is too narrow. The *Bailey* Court announced and applied a clear (if unsupported) rule: the insanity defenses are not available to someone who "brought about" or "induced" a delusion "voluntarily" or with some degree of "premeditation." *Bailey*, 249 Ga. at 537-538 (1).

If *Bailey*'s rule is that the insanity defenses are not available to a defendant who intentionally takes some action to induce one of the relevant mental states, we see no serious basis for distinguishing this case. Sure, this Court applied that rule to a "chronic paranoid schizophrenic" who ignored his doctors' "advice to avoid highly stressful confrontations," 249 Ga. at 537 (1), whereas this case involves a person with bipolar disorder who may have intentionally stopped taking her psychiatric medication. But there is no indication in *Bailey* that the particular kind of mental illness or specific delusion-inducing conduct had any bearing on the legal rule it announced and applied. To the contrary, we cited the intoxication-defense statute, which included an exception for *all* voluntarily intoxicated defendants, see Code Ann. § 26-704 (1968), indicating that the no-voluntary-inducement rule was not specific to the unique facts of that case. See *Bailey*, 249 Ga. at 537 (1).[3] So those distinctions cannot remove this case from *Bailey*'s reach. Under *Bailey*'s rule, just

_____

[3] For this reason, we disagree with the special concurrence's view that *Bailey*'s holding "applies only when the delusion itself was intentionally induced."

25

as Bailey was not entitled to a jury instruction on the insanity defenses because he "induced" his delusions, evidence that Wierson induced her delusions by voluntarily skipping her medications would be relevant to whether the insanity defense would be available to her.

(iii) Having now determined that the insanity-defense statutes cannot be construed to incorporate *Bailey*'s holding that those statutory defenses are not available to a person who induces the relevant mental state, and that *Bailey* controls this case, we must decide whether to keep following *Bailey*.

"When we consider whether to follow one of our past decisions, stare decisis is the strong default rule." *Wasserman*, 320 Ga. at 645 (II) (B) (1) (citation and punctuation omitted). As we have explained before, a system built on following precedent rather than arbitrary discretion not only keeps the body of law more stable, predictable, and reliable, but also promotes and preserves the rule of law. See id. In rare cases, however, following a past decision "would do more harm to the rule of law than overruling it would." *Johnson v. State*,

315 Ga. 876, 887 (3) (885 SE2d 725) (2023). So when we reconsider a precedent, our task is, at bottom, to decide which cost to the rule of law is greater: "whether getting the law right is worth the cost to the rule of law of unsettling what had been settled." *Wasserman*, 320 Ga. at 647 (II) (B) (1). This assessment cannot be reduced to a "mechanical formula or a multi-factor test," but we have identified some guideposts to follow. Id. Among these are features that bear directly on "rule-of-law concerns," like indications that the earlier court was making policy rather than doing law, id. at 645 (II) (B) (1), as well as a limited set of "practical consequences," like upending certain "reliance interests" or "deeply entrenched" rules, id. at 647 (II) (B) (1).

Applying those considerations here, we conclude that *Bailey* must be overruled. Cases that are "unreasoned," or that "disregard[ ] the basic legal principles that courts use to do law," are "ripe for overruling," because leaving apparently arbitrary or policy-driven decisions in place can be "especially harmful to the rule of law." *Wasserman*, 320 Ga. at 645-646 (II) (B) (1) (citation and punctuation

27

omitted). See also *Cobb County v. Floam*, 319 Ga. 89, 94 (1) n.5 (901 SE2d 512) (2024); *Ammons v. State*, 315 Ga. 149, 171 (880 SE2d 544) (2022) (Pinson, J., concurring); *Cook v. State*, 313 Ga. 471, 479 (2) (a) (870 SE2d 758) (2022). *Bailey* fits that bill. *Bailey* turned on a question of statutory construction: whether a statutory delusional-compulsion defense was available to a defendant who had voluntarily induced his delusion. But to answer that question, we never even tried to interpret the statute. Had we done so, we would have been compelled to conclude that the statute's language offered no basis for an exception to the defense and its context confirmed that the legislature did not include such an exception. But instead, we cited an exception to the statutory intoxication defense found next door to the delusional-compulsion defense, and rather than applying the "long-recognized" rule of construction that would have confirmed the absence of such an exception, we divined and created a new exception to the defense that the legislature had plainly declined to include. See *Mooney*, 300 Ga. at 288-289 ("This Court is mindful of the long-recognized doctrine of statutory construction, *expressio unius*

28

*est exclusio alterius*, which discourages judicial recognition of exceptions not specifically set forth in a legislative enactment when other exceptions are expressly stated." (emphasis added)). See also, e.g., *White*, 305 Ga. at 118 (2); *Luangkhot*, 292 Ga. at 427 (4). In doing so, it appears that we improperly substituted our judgment for that of the legislature and made a policy decision instead of doing law — precisely the sort of decision that our Court has not hesitated to overrule. See, e.g., *Woodard v. State*, 296 Ga. 803, 812 (3) (b) (771 SE2d 362) (2015) (overruling statutory construction decision that had, among other things, "disregarded the plain language" of the relevant statute to create an unwritten exception to it and "undermined the policy-making authority of the General Assembly").

*Bailey* is not saved by its status as a statutory-construction precedent. It is true that leaving a wrong decision of statutory construction in place may be relatively less harmful to the rule of law than declining to disturb a bad constitutional construction precedent: because it is generally easier to revise a statute than it is to

amend the Constitution, the likelihood that a wrong decision of statutory construction will remain part of our body of law is relatively lower than if the decision involves constitutional construction.[4] See, e.g., *Olevik v. State*, 302 Ga. 228, 245 (2) (c) (iv) (806 SE2d 505) (2017). But we have also consistently said that "stare decisis applies with less force" when, as here, "we have misinterpreted a statute by failing to consider the statute's language at all." *Nalls v. State*, 304 Ga. 168, 179-180 (3) (b) (815 SE2d 38) (2018). See, e.g., *State v. Burns*, 306 Ga. 117, 122 (2) (829 SE2d 367) (2019) (overruling statutory-construction decision that was "reached without any meaningful analysis"); *Southall v. State*, 300 Ga. 462, 464, 467 (1) (796 SE2d 261) (2017) (overruling statutory-construction precedent that was two sentences long and contained no statutory construction); *Woodard*, 296 Ga. at 812 (3) (b) (overruling precedent that disre-

---

[4] Reasonable minds may differ on how much less "permanent" an incorrect statutory construction precedent is compared to a constitutional construction precedent, particularly in Georgia, where constitutional amendments are somewhat easier to get across the finish line than at the federal level.

garded language of statute and applied no canons of statutory construction); *State v. Jackson*, 287 Ga. 646, 653 (3) (697 SE2d 757) (2010) (overruling statutory-construction precedent that, in a "one-and-a-half page opinion," failed to consider the "customary legal meaning" of a statutory term and did not "look to our then-existing case law interpreting that term"). See also *Mobley v. State*, 307 Ga. 59, 73-75 (4) (a) (834 SE2d 785) (2019) (criticizing as "unsound" a prior decision that interpreted a statute without giving consideration to its legal context or the background law of Georgia at the time of its enactment). As Justice Blackwell once explained,

> [w]e have a duty to ascertain the meaning of the statutory law, and we must endeavor to do so in a way that is consistent with the familiar and settled principles of statutory interpretation. Sometimes we may get it wrong, and yet, if we have made our best effort, it may be more appropriately left to the General Assembly to set things right. But before we call it a day and declare our judicial work at an end, we ought to try at least once to undertake the sort of careful textual analysis (including a consideration of relevant context) that, if done properly, would reveal the most natural and reasonable understanding of the statute. . . . "We ought not follow unreasoned precedent without reason."

*Patterson v. State*, 299 Ga. 491, 516 (4) (789 SE2d 175) (2016) (Blackwell, J., dissenting) (quoting *Crayton v. State*, 298 Ga. 792, 803 (784 SE2d 343) (2016) (Blackwell, J., dissenting)). Just so here.

Finally, a look at the practical consequences we have considered in assessing stare decisis does nothing to save *Bailey*. We are aware of no "reliance interests" that have built up around *Bailey*'s judge-made exception to the insanity-defense statutes, nor can we imagine that citizens make decisions about their behavior based on that exception. See *Wasserman*, 320 Ga. at 647 (II) (B) (1). Nor has *Bailey* become "deeply entrenched" in our law, see id. To the contrary, as far as we can tell, the decision has been cited in only eight other appellate opinions (before this case) since it issued in 1982, and only one of those opinions, a concurrence, referred to the holding at issue here. See *VanVoorhis v. State*, 234 Ga. App. 749, 751 n.3 (507 SE2d 555) (1998) (Beasley, J., concurring). So these considerations do not cut against overruling *Bailey* either.

For these reasons, stare decisis does not preserve *Bailey*'s hold-

ing that the statutory insanity defenses are not available to a defendant who "intentionally" or "voluntarily" induced the relevant mental state. That holding is overruled.

(c) *Application*

We can now return to Wierson's case. Given our conclusions above, resolving this case is straightforward. Wierson pleaded not guilty by reason of insanity, and she put up evidence — the two psychiatrist reports — that, at the time of the accident, she lacked the mental capacity to tell right from wrong and also suffered from a delusional compulsion. Under OCGA §§ 16-3-2 and 16-3-3, if the jury were to credit that evidence, then Wierson cannot be guilty of a crime, full stop. The State sought to introduce evidence that Wierson may have stopped taking her medication before the accident, but the State's only justification to the trial court for the relevance of that evidence — that it would show that Wierson's mental state was "voluntary" — fails, because that is not a basis for making the statutory insanity defenses unavailable to Wierson.

Two final points. First, the State made an additional argument

for the first time in the Court of Appeals about the relevance of medication non-compliance: that it was relevant not to whether Wierson could assert an insanity defense, but to whether Wierson had the requisite criminal intent. See *Wierson*, 372 Ga. App. at 105 (1). But the Court of Appeals rejected that argument, see id. at 110-111 (1) (b), and we did not grant review on the question. So although the State has made the same argument in its briefing in this Court, we do not reach the issue. See *Rockdale Hospital, LLC v. Evans*, 306 Ga. 847, 853 (3) (834 SE2d 77) (2019) (declining to reach issue on which Court did not grant certiorari); *State v. Fletcher*, 252 Ga. 498, 500 n.1 (314 SE2d 888) (1984) (same).

Second, on a related note, our conclusion here does not foreclose the admission of evidence of medication non-compliance for *all* purposes when a defendant pleads not guilty by reason of insanity. For example, as we noted above, evidence that a defendant was not following her medical course of treatment before an alleged offense might be admissible to show that, *at the time of the offense*, she lacked mental capacity or suffered from a delusional compulsion —

34

that is, that she satisfies the requirements for asserting one of the statutory insanity defenses. But in this case, neither Wierson nor the State proffered the medication non-compliance evidence for that purpose. So whether that evidence might be relevant to another purpose is not before us, and we do not address it further.

3. *Conclusion*

In sum, we ultimately agree with the Court of Appeals that evidence of Wierson's medication non-compliance was not admissible to show that she "voluntarily" induced her lack of mental capacity or delusional compulsion, because the statutory insanity defenses are available without regard for whether that was true. We also agree with the Court of Appeals that *Bailey* does not compel a different conclusion, but for a different reason than the Court of Appeals gave. Contrary to that court's view, *Bailey* would control here. But it was wrongly decided, and today, after considering stare decisis, we overrule its holding that created a judge-made exception to the statutory insanity defenses. Finally, we do not reach the remaining issues decided by the Court of Appeals in Case No. A24A0241.

*Judgment affirmed. Warren, P. J., and Bethel, Ellington, McMillian, and LaGrua, JJ., concur. Peterson, C .J., and Colvin, J., concur specially.*

PETERSON, Chief Justice, concurring specially.

I agree with much of what is said in the majority opinion. I agree with the majority opinion's construction of the insanity-defense statutes. I agree that our invention of an exception to those statutes in *Bailey v. State*, 249 Ga. 535 (291 SE2d 704) (1982) was error. And I agree that we should affirm the judgment of the Court of Appeals.

Where I part ways with the majority opinion is what to do with *Bailey*. The majority opinion defines *Bailey*'s holding broadly such that it would control this case, and then proceeds to overrule *Bailey*. But the majority opinion's definition of *Bailey*'s holding is unnecessarily broad; in my view, *Bailey*'s holding is reasonably understood to be narrow enough that it does not apply here.

The majority opinion frames the holding of *Bailey* as rendering the insanity defenses unavailable "to a defendant who intentionally

36

takes some action to induce one of the relevant mental states." Op. at 607. If that is the holding of *Bailey*, I agree that the holding would control this case. But *Bailey*'s discussion of intentionality was not limited to taking the action that induced the delusion; i.e., it was not just about intentionally (rather than merely negligently) failing to take precautions against delusions. Instead, *Bailey*'s reasoning indicates that its rule applies only when the delusion itself was intentionally induced: "a chronic paranoid schizophrenic may no more voluntarily and intentionally induce his delusion. . . ." 249 Ga. at 537 (1). And the *Bailey* Court reiterated this point three paragraphs later: "it must be said that he brought that delusion about with as much premeditation as a chronic alcoholic who, in the same circumstances, might have prepared himself for the impending confrontation by imbibing alcohol to excess." Id. at 538 (1).

Read in that light, I understand *Bailey*'s holding as this: a defendant may not voluntarily and intentionally cause a state of mind that the defendant knew may well result in criminal activity and then be relieved of criminal responsibility because of the

intentionally induced state of mind. In that reading, the inducing of the state of mind is akin to a conspiracy to do the bad act initiated at a time before the state of mind was present. And this case involves no evidence of any such intentionality; unlike *Bailey*, where the intentional inducement of delusion happened in the minutes before the crime, here the discontinuation of medication happened weeks before the criminal act. So *Bailey* does not apply, and we have no need to reconsider it here.

Accordingly, I would arrive at the same conclusion as the Court of Appeals that *Bailey*'s holding does not apply to this case (albeit for somewhat different reasons), and thus I cannot join the majority opinion, although I do concur in the judgment.

I am authorized to state that Justice Colvin joins in this concurrence.

Decided May 28, 2025.

Certiorari to the Court of Appeals of Georgia — 372 Ga. App. 102.

*Sherry Boston, District Attorney, Samuel R. D'Entremont, Thomas L. Williams, Ellie M. Harris, Assistant District Attorneys*, for appellant.

*Peters Rubin Sheffield & Hodges, Robert G. Rubin; Garland Samuel & Loeb, Kristen W. Novay*, for appellee.

*Justin T. Moore; Devin A. Rafus, Lauren B. Shubow, Amanda J. Walker, Hunter J. Rodgers; Cory H. Isaacson, Matthew R. Segal*, amici curiae.